# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. |
| | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

❏ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| | |

The application is based on these facts:

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: _____

_____
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**</u>

Your affiant, Robert C. Lockhart, Special Agent of the Federal Bureau of Investigation ("FBI"), United States Department of Justice, being duly sworn, state as follows:

## I.   <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.       I am a Special Agent of the FBI and have been so employed since 1996.  I am currently assigned to the FBI Philadelphia Division, Newtown Square Resident Agency (NSRA), Delaware Valley Violent Crime Task Force (DVVCTF) and have been so assigned since January 2012.  A primary mission of the DVVCTF is to identify, disrupt, and dismantle existing and emerging violent criminal enterprises, drug trafficking organizations, and street gangs.  I am thus familiar with the methods of gang and drug organizations and their operations, the terminology used and the scope of their influence.  Prior to my assignment at the NSRA/DVVCTF, I was assigned from 2008 to 2011 to the FBI Philadelphia Violent Gang Task Force, where I also investigated violent street gangs and narcotics.  Prior to being assigned to the FBI Philadelphia Division in 2008, I was assigned to the FBI's Washington Field Office (WFO), FBI/MPD Safe Streets Gang Task Force from 1999 to 2006 where my primary mission was working violent street gangs and criminal narcotics organizations.

2.       During my employment with the FBI, I have been assigned to the investigation of violent narcotics traffickers and have previously participated in hundreds of investigations which led to the arrest and conviction of narcotics dealers.  Since 1996, I received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, white collar crimes, search warrant applications, and various other crimes.  In my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug

conspiracies.  In the course of conducting these investigations, I have been involved in the use of

the following investigative techniques: interviewing informants and cooperating witnesses;

conducting physical surveillance; conducting short term and long term undercover operations,

including reverse undercover drug operations; consensual monitoring and recording of both

telephonic and non-telephonic communications; analyzing telephone pen register and caller

identification system data; conducting court authorized wire and oral interception and other

electronic surveillance; and preparing and executing search warrants which have led to

substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity.

have conducted interviews of defendants, informants, and witnesses who had personal

knowledge regarding narcotics trafficking organizations, and have participated in all aspects of

narcotics investigaiton including search warrant executions, conducting surveillance, conducting

undercover operations, analyzing information obtained from court-ordered pen register and trap

and trace intercepts, and analyzing telephone toll information obtained as a result of the issuance

of subpoenas. During my law enforcement career, I have participated in numerous cases

involving the distribution of narcotics where court-ordered electronic surveillance has been

utilized.  Your affiant also knows that narcotics traffickers routinely keep firearms in their

possession, on their person or in their homes, to protect their illegal drug enterprise from theft,

robberies and law enforcement interdiction.

   3.  I am an "investigative or law enforcement officer of the United States" within the

meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigation of and to make arrests for offenses

enumerated in Title 18, United States Code, Section 2516.

II.    <u>**PURPOSE OF THIS AFFIDAVIT**</u>

4.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the collection of buccal swabs for the purpose of submitting them for a comparative DNA analysis from the following individual who is currently in federal custody, located at the Federal Detention Center in Philadelphia, PA:

     a.    Frederick Donaldson-Lockley, date of birth January 1, 1994, FBI No. 41412534, (hereafter "DONALDSON-LOCKLEY")

5.      In summary, this affidavit is being submitted in support of applications for a search warrant for the collection of buccal swabs from the person of DONALDSON-LOCKLEY. Since this affidavit is being submitted for the limited purpose of securing a search warrant for saliva samples, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to obtain the buccal swabs of DONALDSON-LOCKLEY for the purpose of submitting them for a comparative DNA analysis.

6.      I was personally involved in the drug trafficking investigation described below and have been assigned as one of the lead case agents in this investigation since the spring of 2016. The facts set forth below are derived from information known personally to me, and on information received from other law enforcement agents and officers, agents of the FBI, DEA and Task Force Officers, including members of the Chester Police Department, as well as the following investigation methods:

     a.    Physical surveillance;

     b.    Observations made and information gathered through arrests of various individuals involved in drug trafficking;

c.      Information provided by confidential sources, including recorded telephone conversations and in-person meetings with the subjects under investigation;

d.      Purchases of controlled substances by confidential sources;

e.      Information and evidence obtained from Court authorized search warrants; and Court authorized Title III wire and electronic intercepts;

f.      Review of records and documents of federal and/or state government agencies, and records and documents maintained in the normal course of business by private concerns.

7.      As set forth below, I submit that there is probable cause to believe that DONALDSON-LOCKLEY has committed multiple federal crimes including the possession of a firearm during the commission a crime of violence and/or serious drug crime, in violation of Title 18, United States Code, Section 924(c), and that the DNA sample sought from DONALDSON-LOCKLEY is likely to constitute evidence of such crimes.

III.    **PROBABLE CAUSE SUPPORTING DNA COLLECTION**

A.      **Background of Investigation**

8.       In April 2016, the FBI and DEA opened a full investigation on a drug organization operating in the west side of Chester, PA in response to a request from the Chester Police Department (CPD) regarding the ongoing violence and narcotics activity in that section of the city of Chester.  This particular drug organization goes by the moniker "3BM" and/or "3rd Bone" and is known to be involved in narcotics distribution and gang related violence.  The "3" or "3rd" in the monikers refers to Third Street which is the main east/west thoroughfare that runs through the target area. The moniker "3BM" is short for "3rd Bone Music" a rap music production group that has produced several YouTube music videos which prominently feature

4

several 3rd Bone members in them and also which have numerous references to firearms, violence and narcotics sales. It is noted that the investigation has revealed that over the past several years numerous members of 3rd Bone group have, at certain times, aligned themselves with members of the William Penn Project Drug Trafficking Group (DTG), aka the "Ject Boyz," another "West side" of Chester gang that has been involved in ongoing violence with "East side" neighborhood gangs.

9.      Information learned during the investigation revealed an internal "beef" or dispute had developed between members of the 3rd Bone and William Penn factions which led to several shootings between members of the 3rd Bone and William Penn groups. The William Penn Projects is a public housing development sitting just a few blocks to the east down 3rd Street from the 3rd Bone territory that has historically been known for heavy narcotics activity along with related violence. The William Penn Projects are bordered by 5th Street to the north, Union Street to the south, Parker Street to the West and Franklin Street to the east.

10.      During this investigation, the FBI and DEA, working with other law enforcement officers including members of the Chester Police Department, have conducted in excess of 60 controlled purchases of crack cocaine, cocaine and heroin from members and associates of 3rd Bone group members utilizing confidential informants, which includes six (6) purchases of crack cocaine from DONALDSON-LOCKLEY. Federal and other law enforcement officers have also observed in excess of a hundred suspected narcotics transactions being conducted by 3rd Bone members and their associates on pole camera surveillance, and on several occasions law enforcement officers have stopped and interviewed individuals who made purchases of crack cocaine from 3rd Bone members and their associates and have recovered crack cocaine "stashes" in the target area. Since the inception of the investigation, numerous firearms have been

recovered from this area and several members or associates from the 3rd Bone group have been arrested for narcotics offenses.

11.     On October 23, 2019, a federal grand jury sitting in the Eastern District of Pennsylvania indicted DONALDSON-LOCKLEY and twelve (12) of his co-conspirators as members of the 3rd Bone Drug Trafficking Group (DTG), a criminal conspiracy responsible for distributing well in excess of 280 grams of cocaine base ("crack"), cocaine, fentanyl, and heroin in and around a geographic territory that the DTG controlled in Chester, Pennsylvania.

12.     As detailed in the indictment, the members of the 3rd Bone DTG coordinated their drug trafficking activities, maintained control over their drug territory using firearms and violence, and carried out numerous shootings and other acts of violence against rival drug dealers and others who crossed them.  DONALDSON-LOCKLEY is specifically charged in Counts One (conspiracy to distribute 280 grams or more of cocaine base ("crack"), cocaine, fentanyl, and heroin), Two, Three, Fourteen, Thirty-Two, and Thirty-Five (specific incidents of distribution of crack cocaine) of the indictment.

13.     The evidence in the case include audio and video recordings of DONALDSON-LOCKLEY distributing crack cocaine to confidential informants. If convicted on all counts, DONALDSON-LOCKLEY will face a total maximum sentence of up to 120 years' imprisonment. A trial date has been scheduled for this matter before the Honorable Chief Judge Juan Sanchez and is currently scheduled for November, 9, 2020. DONALDSON-LOCKLEY was arrested on October 30, 2019 on these charges and is currently detained at FDC Philadelphia.

**B.** **The Ginn's Bar Shooting Incident on February 21, 2019**

14.      The requested DNA sample for comparison is sought with regard to a specific

violent incident that occurred during the course of the above-described conspiracy, after which

DNA evidence suitable for comparison was recovered, and in which your affiant believes

DONALDSON-LOCKLEY directly participated.  The circumstances and evidence relating to

that incident are describe in the following section.

15.      On January 31, 2019, Judge Cynthia M. Rufe, United States District Court for the

Eastern District of Pennsylvania, had signed orders authorizing the continued interception of

wire communications (Title III) on TARGET TELEPHONE 4 for an additional 30-day period

and initial interception of wire and electronic communications for a 30-day period on TARGET

TELEPHONE 6, both are which were phones being used by William Penn member Kaleaf

Gilbert ("GILBERT"). Actual continued interception of TARGET TELEPHONE 4 and initial

interception of TARGET TELEPHONE 6 began the morning of February 1, 2019. Actual

interceptions of TARGET TELEPHONE 4 and TARGET TELEPHONE 6 terminated on March

2, 2019.

16.      On February 21, 2019, the FBI, DEA and FBI Task Force Officers from Chester

PD were actively monitoring the Title III intercepts on GILBERT's cell phones (TARGET

TELEPHONE 4 and TARGET TELEPHONE 6) when surveillance units monitoring Delcom

Radio learned that Chester PD officers were being dispatched at 12:50 pm to a shooting that had

just occurred at Ginn's Bar, located at 700 W. 2nd Street in Chester, PA.

17.      Witnesses in the area described a black SUV arriving in the Ginn's Parking lot

with at least two individuals exiting and opening fire at another vehicle that was already parked

in the lot. A Chester PD crime scene officer processed the scene of the shooting and located in

7

the parking lot multiple spent shell casings and projectile jackets, as well as a Ruger SR9C handgun with an obliterated serial number that had one live round remaining and which was stove-piped (describing a malfunction of the firearm based on a jammed round). The Ruger 9mm handgun was swabbed for DNA using two (2) DNA touch swabs by the crime scene officer. The trigger, grip, slide and magazine were all swabbed. The weapon was dusted for prints but no prints of value were located.  The DNA touch swabs were sent to the Pennsylvania State Police (PSP) lab for analysis.

18.     Later that same afternoon, Chester Police Detectives responded to Thomas Jefferson Hospital in Philadelphia to interview a shooting victim, who had self-reported to the hospital. Philadelphia Police (PPD) had contacted Chester Police and advised that at approximately 3:22 pm, Frederick DONALDSON-LOCKLEY walked into Thomas Jefferson Hospital (Philadelphia).  At the time of his treatment, DONALDSON-LOCKLEY reported to police officers that he had been shot randomly as he walked along South Street in Philadelphia. When Philadelphia police responded to the location where DONALDSON-LOCKLEY claimed to have been shot, however, they found no indication that a shooting had actually taken place there. Nor did any witnesses in the area report anything consistent with a shooting having occurred. Your affiant is familiar with South Street in the city of Philadelphia and knows that area to be both densely populated and heavily trafficked by foot and vehicle. If DONALDSON-LOCKLEY had been shot in the area of South Street, as he claimed, your affiant believes it is highly likely that there would have been reports of a shooting, witnesses, or some other evidence that such an event occurred. Given that officers found no such evidence, your affiant submits that the more likely scenario is that DONALDSON-LOCKLEY was actually wounded in the Ginn's

Bar shooting in Chester and traveled to Philadelphia for treatment in order to disguise his involvement in this shooting incident.

19.     Through informants and wiretap intercepts and other investigation, investigators learned that the intended targets in the Ginn's bar shooting had been two members of the William Penn DTG, GILBERT and Issac Barrett ("BARRETT").  As noted above, at the time of the shooting, agents were aware of ongoing conflict between the William Penn DTG and the 3rd Bone DTG, of which DONALDSON-LOCKLEY was a member.  Based in part on contemporaneous interceptions of GILBERT's cell phone, agents determined that GILBERT had returned fire when fired upon in the Ginn's bar parking lot, potentially hitting one or both of the assailants. Following the exchange of gunfire, GILBERT abandoned the bullet-hole ridden vehicle in which he had been traveling as well as the firearm he used in the incident. In intercepted calls with other individuals, GILBERT described where he had discarded these items.

20.     At approximately 5:15 pm on February 21, 2019, Chester Police were able to recover a Glock Model 27 .40 caliber handgun with an extended magazine from the roof of a home located at 113 Parker Street, Chester, PA. This gun was recovered after agents reviewed intercepted calls over TARGET TELEPHONE 6 in which GILBERT directed another individual to take a ladder to that location to retrieve an item from the roof. Chester Police also located GILBERT's rental Jeep Cherokee nearby with bullet holes in the front windshield parked in an alleyway running alongside of that twin residence (111/113 Parker Street.)

21.     On April 30, 2019, members of the FBI, DEA and the Chester Police Narcotics Unit executed a Federal search warrant at 200 Saude Avenue, Essington PA, (the home residence of BARRETT) as part of the above investigation. Located in the bedroom identified as BARRETT's were the following items of note: a Glock 23 handgun, $9,000.00 dollars of U.S.

currency as well as numerous items of drug paraphernalia that are used for the packaging and distribution of narcotics.  Located in a makeshift closet just outside the bedroom identified as BARRETT's was a little over 150 grams of cocaine base ("crack.") Additionally, BARRETT's cell phone (TARGET TELEPHONE 7), which had been the subject of an active Title III interception was seized and later search pursuant to a separate federal search warrant.

22.     When investigators reviewed the contents of BARRETT's cell phone, they located saved Facetime video related to the Ginn's bar shooting.  In the recovered video, BARRETT and another individuals can be seen reviewing security system surveillance video from the exterior parking lot camera at Ginn's Bar on the day of the shooting. During the video, BARRETT both records and narrates the surveillance camera footage, slowing and playing back key parts of the incident.  As can be seen from the video—and consistent with the witness accounts at the time—two hooded men emerged from behind a structure, raise their arms, and begin firing in the direction of their targets (believed to be GILBERT and BARRETT). On the video, BARRETT then pauses the surveillance recording, gestures at one of the hooded shooters and says, "that look like BD."  It is noted that investigators have learned "BD" is a nickname commonly used by DONALDSON-LOCKLEY, as reflected on several social media postings in which DONALDSON-LOCKLEY is pictured and referred by that nickname. On the video, BARRETT then requests to let the surveillance footage play. As the footage proceeds, the shooter who BARRETT identified as "look[ing] like BD" is seen to fall, apparently hit by return gunfire. That individual stumbles and falls backwards and appears to drop the firearm that he was holding. The other shooter who is wearing all black also stumbles as he falls backward over a piece of equipment or furniture. The two shooters then get back into a black Ford Edge. The driver, who BARRETT refers to by saying, "That's R", appears to fire additional rounds from a

handgun in the direction of the incoming return gunfire. It is noted that investigators know that 'R' is a nickname used by Ronald Collins, a known associate of DONALDSON-LOCKLEY and other 3rd Bone DTG members.

### E.    Report from PSP DNA Laboratory

23.    The government received a PSP DNA Laboratory Report, dated August 20, 2019, providing testing analysis results for DNA swabs taken from the Ruger SR9c handgun that was recovered by police in the Ginn's Bar parking lot after the above-described incident.  The results showed that a DNA profile, consistent with a mixture of at least three (3) individuals, was obtained from the swabs of the gun. Additionally the PSP DNA laboratory indicated that if a direct DNA comparison to an individual was desired, investigators should submit a blood sample in a lavender top tube or a buccal collector from the individual to the laboratory.

## IV.   CONCLUSION

24.    Based on the foregoing, your affiant believes that DONALDSON-LOCKLEY was one of the shooters who attacked GILBERT and BARRETT, that DONALDSON-LOCKLEY was hit by return fire during the incident, and that DONALDSON-LOCKLEY subsequently fabricated his story about being shot on South Street in Philadelphia in an attempt to conceal his involvement in the Ginn's Bar shooting.

25.    Your affiant further submits that there is probable cause to believe that the DNA of DONALDSON-LOCKLEY will be present on the 9mm Ruger SR9c recovered from the Ginn's Bar parking lot. The requested sample for comparison, therefore, is highly likely to serve as evidence of DONALDSON-LOCKLEY unlawful use and possession of this firearm.

26.    Your affiant, therefore, respectfully requests that the attached warrant be

Issued, authorizing your affiant to take buccal swabs—specifically, cotton swabbings from the inside of the mouth in the cheek area of DONALDSON-LOCKLEY—for further testing and analysis by a government crime laboratory or private laboratory in connection with this matter.

**I swear under oath that the above is true and correct to the best of my knowledge and belief.**

/s/ Robert C. Lockhart
Robert C. Lockhart, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 15th day of July, 2020.

/s/Thomas J. Rueter
HONORABLE THOMAS J. RUETER
UNITED STATES MAGISTRATE JUDGE

## **<u>ATTACHMENT A</u>**

The following items to be taken from the body of FEDERICK DONALSON-LOCKLEY

(DOB: January 1, 1994; FBI No. 41412534):

    1.     Saliva (Four cotton swabs (buccal swabs) of the buccal cavity of FEDERICK DONALSON-LOCKLEY).

**ATTACHMENT B**

Items to be searched for and seized/documented from the person identified on

Attachment A, and as described in the Search Warrant and Affidavit of Probable Cause, both of

which are incorporated herein, related to violations of 18 U.S.C. § 924(c)(1)(A):

1.  The DNA of FEDERICK DONALSON-LOCKLEY (DOB: January 1, 1994; FBI No. 41412534) for submission of comparative DNA analysis.